IN THE DISTRICT COURT OF APPEAL
FIRST DISTRICT, STATE OF FLORIDA

JUAN ALVAREZ,

      Appellant,

v.

FORT PIERCE POLICE
DEPARTMENT,

      Appellee.

NOT FINAL UNTIL TIME EXPIRES TO
FILE MOTION FOR REHEARING AND
DISPOSITION THEREOF IF FILED

CASE NO. 1D15-2115

_____/

Opinion filed February 16, 2016.

An appeal from an order of the Judge of Compensation Claims.
Robert D. McAliley, Judge.

Date of Accident: February 7, 2014.

Bill McCabe, Longwood, for Appellant.

Lamar D. Oxford and Alan D. Kalinoski of Dean, Ringers, Morgan & Lawton, Orlando, for Appellee.

PER CURIAM.

In this workers' compensation case, Claimant argues that the Judge of Compensation Claims (JCC) erred in denying his claim for payment of medical bills incurred after he was discharged from the emergency room for a workplace injury.

Because the JCC's findings of fact are inconsistent with the medical records and doctor's opinion concerning the medical testing reasonably required by the nature of the injury, we agree and reverse the order below.

I

On February 7, 2014, Claimant, a law enforcement officer in training, passed out and fell to the ground, striking his head on the concrete pavement. The Employer/Carrier (E/C) accepted compensability of Claimant's head laceration resulting from the blow to the head and paid for the emergency room treatment up through the time of discharge. The E/C nevertheless denied responsibility for Claimant's later hospitalization and additional diagnostic testing which was ordered after an initial CT brain scan was read as indicative of a stroke. The JCC ruled in the E/C's favor based on his finding that the additional diagnostic testing was not directed at assessing or treating the injuries from the blow to the head. On appeal, Claimant argues that the additional diagnostic testing was necessary to diagnose the nature and extent of his compensable head injury.

II

To the extent this issue turns on resolution of the facts, the review standard is competent substantial evidence; to the extent it involves an interpretation of law, the standard is *de novo*. See Benniefield v. City of Lakeland, 109 So. 3d 1288, 1290 (Fla. 1st DCA 2013).

2

Under paragraph 440.13(2)(a), Florida Statutes (2013), employers are required to furnish "such medically necessary remedial treatment, care, and attendance for such period as the nature of the injury or process of recovery may require." Medically necessary treatment includes "any medical service or medical supply which is used to identify or treat an illness or injury." § 440.13(1)(k), Fla. Stat. (2013). It is well established in the case law that diagnostic testing is always compensable if the purpose is to find out the cause of the injured worker's symptoms. See Arnau v. Winn Dixie Stores, 105 So. 3d 669, 671 (Fla. 1st DCA 2013) citing Nealy v. City of W. Palm Beach, 491 So. 2d 585, 586 (Fla. 1st DCA 1986) ("Whenever the purpose of the diagnostic test is to determine the cause of a claimant's symptoms, which symptoms may be related to a compensable accident, the cost of the diagnostic test is compensable."); see also Superior Concrete Constr. v. Olsen, 616 So. 2d 183, 183 (Fla. 1st DCA 1993); Perry v. Ridgecrest Int'l, 548 So. 2d 826, 827-28 (Fla. 1st DCA 1989). This is true even if the tests prove the symptoms are unrelated to the compensable injury. Nealy, 491 So. 2d at 586.

This court has held that the same principle applies in cases governed by the major contributing cause standard (MCC) applicable to dates of accident beginning January 1, 1994. See Chance v. Polk Cty. Sch. Bd., 4 So. 3d 71, 73 (Fla. 1st DCA 2009) (holding JCC erred in applying MCC standard to bar claimant from additional diagnostic testing to determine cause of symptoms); Grainger v. Indian River

3

Transp./Zurich U.S., 869 So. 2d 1269, 1271 (Fla. 1st DCA 2004) (finding JCC applied incorrect standard when he ruled record did not show workplace injury was MCC for requested neurological evaluation because "[a] claimant must establish a causal relationship between his injury and the compensable accident in order to secure *treatment*, but not to be entitled to diagnostic *testing* to determine the *cause* of his symptoms.") (Emphasis in original).

In Grainger, the court articulated the following test: "The correctness of an order refusing a medical evaluation 'must be tested by whether the claimant adequately demonstrated that the evaluation was reasonably required by the . . . nature of the injury. . . .'" 896 So. 2d at 1271 (quoting Sumner v. Gardinier, Inc., 526 So. 2d 1068, 1070 (Fla. 1st DCA 1988)). Cf. Laxner v. Target Corp., 41 So. 3d 396, 397 (Fla. 1st DCA 2010) (finding CSE supported JCC's denial of testing where expert medical opinion established that extent and cause of injuries were known and ascertainable). Thus, in the instant case, Claimant had the burden of showing that the diagnostic tests performed during his hospitalization were reasonably required by the nature of his workplace injury. If Claimant meets this burden, then the evaluation should be covered under workers' compensation. See Grainger, 869 So. 2d at 271.

## III

Here, the E/C asserted that Claimant's head laceration was the only compensable head injury resulting from the fall; at the same time, the E/C acknowledged the possibility that Claimant's head injury may have involved more than a simple laceration. For that reason, the E/C conceded that the *initial* head CT scan was compensable as diagnostic testing following Claimant's fall. But, according to the E/C, once the initial head CT scan without contrast was read as indicative of stroke, no further testing was required for the workplace injury.

Claimant presented the testimony of Dr. Moore, the emergency room physician. Dr. Moore testified that Claimant's symptoms were not consistent with the type of stroke initially presented on the CT scan and "[t]hat's why everything was a little unsure." Taken as a whole, Dr. Moore's testimony establishes: (1) the initial differential diagnosis included conditions such as concussion and dehydration that could be related to the head blow or the work environment; (2) further testing was ordered because the diagnosis of a stroke was uncertain at the time Claimant was hospitalized; (3) a hemorrhagic stroke from trauma, although unlikely, was a possibility; (4) Claimant had a negative neurologic examination; and (5) a carotid arteriogram was ordered to rule out a carotid dissection which can be caused by head trauma. The E/C did not present any expert medical opinion to counter Dr. Moore's opinions.

5

Despite Dr. Moore's testimony, the JCC here found that diagnostic testing related to Claimant's injuries resulting from the blow to the head ended when, in response to the initial CT scan, Dr. Moore admitted Claimant to the hospital for further testing. As a general rule, if a doctor's testimony is unrefuted, the JCC may reject the testimony as unreliable, but must give a reason. See Vadala v. Polk Cty. Sch. Bd., 822 So. 2d 582, 584 (Fla. 1st DCA 2002). Here, the JCC found that Dr. Moore's testimony is "somewhat contradictory."

Although the JCC did not provide any further explanation as to why he implicitly rejected Dr. Moore's testimony with regard to the need for further testing, he nonetheless found that "the medical records [after Claimant's hospitalization] indicate that all testing and observations were performed to determine if claimant had an MCA stroke or a brain tumor." This finding, however, is not supported by the record. First, nothing in the record contradicts Dr. Moore's testimony (which was uncertain only to the extent Claimant's diagnosis was still uncertain and required additional testing) that the carotid angiogram was medically necessary to rule out the possibility of a carotid dissection due to the trauma. Second, Dr. Aldana, the neurologist who first saw Claimant after his hospitalization, did not read the initial CT scan as indicative of stroke, suspected a slow-growing lesion, and raised the possibility of other causes ("an oligodendroglia versus *other etiologies*"). Dr. Aldana also recommended a CT head scan with at least contrast because the pattern

6

of the brain lesion was not consistent with a stroke, and could represent edema (swelling). Third, Dr. Molloy, another neurologist, subsequently recommended a follow-up EEG and repeat CT scan expressly for the purpose of ruling out post-concussive edema. According to the medical records, these two tests were the last ones performed before Claimant was released from the hospital. Thus, the record does not support the JCC's ultimate conclusion that "the purpose of the admission itself and the testing done during hospitalization was not directed at treating or assessing injuries due to the blow to the back of claimant's head."

Based on the record medical evidence, both the E/C and the JCC in this case have overstated the results of the initial CT scan as decisive evidence ruling out the possibility of any relationship between the compensable injury and the need for further testing. Specifically, the JCC overlooked medical reports indicating that further testing was performed to rule out post-concussive edema. For this reason — and because the causes of Claimant's post-injury symptoms have never been determined — we REVERSE and REMAND for entry of an order in accordance with this opinion.

ROBERTS, C.J., WOLF, and THOMAS, JJ., CONCUR.